**GENERAL DYNAMICS CORPORATION**

v.

**The UNITED STATES.**

No. 352–80C.

United States Court of Claims.

Feb. 10, 1982.

Herbert L. Fenster, Washington, D. C., attorney of record, for plaintiff; D. Michael Fitzhugh, Frederic M. Levy, McKenna, Conner & Cuneo, and David A. Rich, Washington, D. C., of counsel.

Stephen G. Anderson, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KASHIWA and BENNETT, Judges.

ON PLAINTIFF'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS AND FOR SUMMARY JUDGMENT ON ITS PETITION

FRIEDMAN, Chief Judge:

The issues before us relate primarily to the basis for determining the damages resulting from the plaintiff's alleged breach of its contract to supply equipment to the government. The Department of Transportation Contract Appeals Board ("the Board") decided that the existing, rather than a prior, termination clause in the contract governed the determination of damages. The government declined to accept that ruling. The plaintiff then brought this suit to recover the amount that it claims it is entitled to under the Board's ruling. The government denies that the plaintiff is entitled to recover anything and has filed a counterclaim. The case is before us on the plaintiff's motion for summary judgment on its petition and to dismiss or for summary judgment on the counterclaim.

We (1) uphold the decision of the Board, (2) grant the plaintiff's motion for summary judgment on its petition insofar as it relates to liability, (3) grant most of the plaintiff's motion to dismiss the counterclaim, and (4) remand the case to the Board.

I.

In January 1973, the plaintiff entered into a fixed-price contract with the Federal Aviation Administration ("FAA") to produce 37 airport radar systems and 40 antennae for approximately $18.2 million. The contract contained the usual "termination for default" clause applicable to fixed-price contracts. Both the radar systems and the first antennae were to be delivered within two years. The contract called for new designs that required many technological improvements over old models. The contractor was expected to do much of the research and development needed to perfect the systems.

The plaintiff was a newcomer to the field and encountered more difficulties than it had anticipated. In mid-1974, both parties recognized that the plaintiff was significantly behind schedule. Each party pointed to the other as the cause of the delays. A series of meetings was held to discuss the problems.

After extensive negotiations, the parties agreed to Modification No. 9 of the contract in March 1975. This modification reduced the number of radar systems to one and changed the delivery requirements. It also changed the basis of compensation from fixed-price to cost-reimbursement, with a lower ceiling price.

There was considerable discussion in the negotiations leading to Modification No. 9 about the type of termination clause to be used. The government wanted to retain the fixed-price termination clause while the plaintiff sought the termination clause normally included in cost-reimbursement contracts.

The significance of this disagreement was that, under a fixed-price termination clause, if the contractor defaults, the government may recover any progress payments covering equipment or services not provided, as well as any excess reprocurement costs. Under a cost-reimbursement termination clause, however, the contractor is entitled to reimbursement of its costs and the government is limited, with some minor exceptions not relevant here, *see* 41 C.F.R.

§ 1–8.604(b) (1980), to the remedies it has under a termination for convenience of the government. These remedies are possession of and title to any finished or unfinished material connected with the contract, plans and information which would have been delivered under the contract, and equipment for which the contractor has been or will be compensated.

The parties ultimately agreed to substitute a cost-reimbursement termination clause for the original fixed-price termination clause. At the same time the following provisions were added to the contract:

> Notwithstanding the clause entitled "Limitation of Cost", it is agreed that the contractor shall complete all work required under this contract, and the Government shall not reimburse the contractor for any costs incurred in excess of $12,799,987.

> All costs incurred in excess of such $12,799,987 shall be borne 100% by the contractor until all contract requirements have been completed. [In this opinion we round off this amount to $12,800,000.]

Problems continued under the contract. In November 1975, the plaintiff stopped work, claiming that the government had breached the contract. The government terminated the contract for default and asserted that "[f]ixed-price default termination procedures are applicable to this contract." The government then contracted with Texas Instruments, Inc., to complete the contract. The government states that it paid Texas Instruments approximately $6.9 million for that work.

The plaintiff filed a claim with the contracting officer for reimbursement of its costs under the new cost-reimbursement termination clause. The contracting officer denied the claim. Contending that fixed-price termination procedures applied, he also demanded the return of the progress payments of approximately $10.6 million that the government had made to the plaintiff.

The plaintiff appealed the contracting officer's decision to the Board. On the plaintiff's motion, the Board severed for initial decision the question whether the fixed-price or cost-reimbursement termination provision applied. After an evidentiary hearing on that issue, the Board held that the cost-reimbursement termination provision was applicable. *General Dynamics Corp.*, 78–2 BCA ¶ 13,281 (1978).

The Board rejected, as based upon "a strained construction" of the contract, the government's contention that despite the substitution in Modification No. 9 of the cost-reimbursement for the fixed-price termination clause, the inclusion of the $12.8 million cost limitation made fixed-price termination procedures applicable. *Id.* at 64,-947. The Board pointed out that in the negotiation of Modification No. 9 the plaintiff had resisted the government's demand for a fixed-price termination clause because it believed that "the obligations inherent in the fixed price clause, particularly the requirement to refund payments made by the Government in the event of default, were inconsistent with the restructured contract and imposed an unacceptable cost risk." The Board also noted that "the Government was well aware of the consequences of including the cost reimbursement clause in the contract. Further, there is no evidence that the Government asserted the theories now relied upon during negotiations leading to Modification No. 9." *Id.* at 64,946.

The government moved for reconsideration. It argued that since the plaintiff's "performance was terminated for default, the Government is entitled to common law damages arising out of the breach of its obligation to complete," and that those damages included recovery of the amounts paid to the plaintiff. *General Dynamics Corp.*, 78–2 BCA ¶ 13,415 at 65,575 (1978). The government relied, as it previously had, upon paragraph 39(h) of the contract, which stated:

> (h) In arriving at the amount due the Contractor under this clause there shall be deducted ... (2) any claim which the Government may have against the Contractor in connection with this contract.

The Board denied reconsideration. *Id.* It reiterated its prior ruling that paragraph

39(e) of the contract, which contains the cost-reimbursement termination provision, rather than paragraph 39(h), governs this case. The Board stated:

> By adopting that clause the parties agreed that in event of contractor's breach, i.e., his failure to perform in accordance with the contract requirements, the rights and responsibilities of the parties would be resolved in accordance with the provisions of that clause. As the Board's decision in the instant appeal stated, the parties considered at length their respective positions in the event Clause 39 would be invoked and the decision to insert it in the contract was a conscious, deliberate act on the part of each party.

*Id.* at 65,577.

After the Board denied reconsideration, the plaintiff again presented its claim to the contracting officer. The contracting officer refused to pay it. He stated:

> The FAA believes that the Board decision is erroneous as a matter of law and that it is therefore not binding upon our agency by reason of the provisions of the "Disputes" clause in the subject contract and the Wunderlich Act (41 U.S.C. 321–22). The case has been referred to the Department of Justice, along with the recommendation that all payments made to General Dynamics under the contract be recouped.

The plaintiff then filed the present case. It seeks $1,868,070, the sum it asserts it is entitled to under the cost-reimbursement termination provision of the contract, plus interest. The government filed an answer denying liability and a four-count counterclaim.

Count 1 asserted that the plaintiff had breached the contract by abandoning performance under it. That count sought rescission of the contract and restitution of the approximately $10.6 million the government had paid to the plaintiff.

Count 2 sought recovery of the approximately $4.7 million additional cost the government had incurred when it contracted with Texas Instruments to complete the contract.

Count 3 sought to reform the contract to return to the terms and conditions it contained immediately before Modification No. 9 had been executed. The theory of this count was that the plaintiff's representation during the negotiation of Modification No. 9 that the plaintiff would complete the contract even if its costs exceeded $12.8 million was untrue.

Count 4 asserted that the Board's decision was erroneous because it misinterpreted the contract and because, to the extent that the Board allowed breach of contract claims, the agency had no jurisdiction to do so.

The plaintiff has moved for summary judgment on its petition and to dismiss or for summary judgment on the counterclaims.

## II.

■ Subject to the qualifications set forth in part IV of this opinion, we agree with the Board that the cost-reimbursement termination clause of the contract governs the determination of damages.

The substitution of the cost-reimbursement termination clause in Modification No. 9, for the fixed-price termination clause that originally was in the contract was a considered act the parties took with full awareness of its consequences. The issue was the subject of vigorous and protracted negotiation, and both parties were aware of the significance of the two types of termination clauses.

The plaintiff sought the change because, as one of its negotiators, Mr. Golden, explained, the plaintiff believed that when the contract was restructured, it should be a cost-plus contract in view of its developmental character. He stated that the plaintiff objected to a fixed-price termination clause because the plaintiff "did not want any part of any deal that would require us, after all the work we had put into this, an expenditure of some $9–, $10–, $11–million at that time, to be in a position where we would have to refund that money."

478

Mr. Connors, the government's contracting officer, stated that the government wanted a fixed-price clause because "under a cost-type termination clause," if the plaintiff did not complete the contract, "the government could not recover the funds that were paid to General Dynamics." Mr. Connors, however, was "unsuccessful in trying to put this clause in the contract" because the plaintiff "refused to take it."

For various reasons—of which, as the Board found, 78–2 BCA ¶ 13,281 at 64,942, the government's "dire need" for the radar systems "was most prominent"—the government decided that rather than terminating the contract for default, it would accept the proposed restructuring of the contract. That restructuring included the substitution of the cost-reimbursement for the fixed-price termination clause.

The government argues, however, that the inclusion in Modification No. 9 of the provisions by which the contractor undertook to complete the contract for $12.8 million and agreed to bear all costs in excess of that amount necessary to complete the contract (which we shall refer to as the "cost-limitation provision"), had the effect of reconverting the contract back into a fixed-price contract to which the fixed-price termination provision would apply. We do not so interpret the contract. As we discuss in part IV below, the cost-limitation provision gave the government additional rights if the plaintiff did not complete performance that it would not have had under the reasonable-cost termination provision alone.

The cost-limitation provision, however, did not cancel the reasonable-cost termination provision or make it ineffective. The latter provision reflected the informed judgment and decision of both parties that this was one of the terms upon which the contract would be continued. Indeed, the statements of the representatives of both sides discussing the reasons each insisted upon the particular termination provision it sought, discussed above, are inconsistent with the government's present contention that despite the substitution of the reasonable-cost for the prior fixed-price termina-

tion provision, the latter remained in effect. Moreover, as the Board noted, the government had not communicated its present interpretation of the contract to the plaintiff during the negotiations leading to Modification No. 9.

Whenever possible, the terms of a contract must be read consistently with each other and so as to give them full effect. *Arizona v. United States*, 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978). The government's interpretation of the contract would virtually eliminate the reasonable-cost termination provision.

We therefore conclude that the plaintiff is entitled to recover its additional reimbursable costs under the contract. The plaintiff states that the amount is $1,868,-070. At oral argument the government stated that it disputes that figure. This issue, therefore, must be remanded to the Board to determine the amount of the plaintiff's recovery.

In view of our decision on this issue, it is unnecessary to consider the question, which the parties have vigorously argued, whether a Department of Transportation regulation permitting the Department to deny payment pursuant to an adverse Board decision that it believes to be "appropriate" for judicial review, 41 C.F.R. § 12–1.318–53(a) (1980), creates an exception to the rule of *S & E Contractors, Inc. v. United States*, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972). The Court there held that, except in cases of alleged fraud upon a Board of Contract Appeals, the government cannot obtain judicial review of a Board decision favorable to the contractor that the contractor accepts. We referred to but did not decide that issue in *Fischbach & Moore International Corp. v. United States*, 223 Ct.Cl. 116, ——, 617 F.2d 223, 228 (1980).

III.

In its counterclaim, the government asserted two theories to escape the Board's ruling that the reasonable-cost termination provision of the contract applies.

A. In count 1 of its counterclaim, the government seeks rescission of the contract and return of the $10.6 million it has paid to the plaintiff. It proposes this relief on the ground that the plaintiff breached the contract by abandoning performance.

We reject the government's attempt to obtain indirectly the same relief it would have obtained directly if we had accepted its position that the fixed-price termination provision applies. When the government agreed to substitute for the latter provision the reasonable-cost termination provision in Modification No. 9, it and the plaintiff necessarily agreed that the latter and not the former cost-termination provision would control.

It would be inconsistent with the basic intent and design of Modification No. 9 to permit the government to use a rescission theory to obtain the measure of damages it would have obtained under the termination provision that it agreed to eliminate from the contract. The government also may not accomplish that result by framing its theory as a common law breach-of-contract claim. We therefore shall dismiss count 1 of the counterclaim.

B. In count 3 of the counterclaim, the government seeks to reform the contract to return it to the terms it had immediately before Modification No. 9 was executed. In other words, the government would reform the contract by reverting to the fixed-cost termination provision in the original agreement.

The government's ground for seeking this relief is that the plaintiff made a misrepresentation during the negotiation of Modification No. 9 when it stated that it would complete the contract even if the cost of doing so exceeded $12.8 million. The government asserts that since the plaintiff denies that it did not intend to complete the contract, there is a disputed question of fact that precludes granting the plaintiff's motion for summary judgment on this issue.

Before the Board, however, the government took the opposite position. There it asserted that the plaintiff intended to complete performance under the contract. As the Board indicated, the government relied on that claim "to support the assertion that appellant was absolutely required to complete or forfeit the proceeds of the contract." 78–2 BCA ¶ 13,281 at 64,946. Moreover, as the Board pointed out, in its reply brief before that agency, the government had disavowed any allegation of fraudulent conduct by the plaintiff during the negotiations. *Id.*

The Board held that, "The evidence is that appellant did intend to complete." *Id.* We have no basis for disagreeing with that factual determination. In the posture of this case, therefore, the underlying premise of count 3 is inconsistent with, and indeed contrary to, the Board's finding, which we accept. We therefore shall dismiss count 3 of the counterclaim.

### IV.

In count 2 of the counterclaim, the government seeks recovery of the additional costs it incurred when it contracted with Texas Instruments to complete the contract. The government states that the additional cost was $4.7 million. If the government properly terminated the contract for the plaintiff's nonperformance— an issue the Board has not yet determined and which we remand to that agency to decide—the government is entitled to recover the additional amounts above the ceiling price in the contract that it spent to have performance completed.

When in Modification No. 9 the parties substituted the standard reasonable-cost for fixed-price termination provision, they also added a nonstandard provision relating to the total cost of the work. That provision stated that the plaintiff "shall complete all work required under this contract, and the Government shall not reimburse the [plaintiff] for any costs incurred in excess of $12,799,987." It further provided that all costs in excess of that amount "shall be borne 100% by the contractor until all contract requirements have been completed."

This provision obviously was intended to create additional obligations and rights be-

sides those in the reasonable-cost termination provision. It obligated the plaintiff to complete the contract at a total cost of not more than $12.8 million and to bear all costs of completion in excess of that amount. If one of those costs of completion was excess expenses the government incurred if the plaintiff breached its obligation to complete, the plaintiff is liable for that amount.

The cost-limitation provision also was the product of the extensive negotiations leading to Modification No. 9. When it agreed to Modification No. 9, the government had the right to rely upon the plaintiff's commitment to complete performance for the stated price. If the plaintiff breached that obligation, the government is entitled to recover its damages from the breach.

As we have held, the $12.8 million cost ceiling did not convert the reasonable-cost reimbursement provision back into a fixed-price termination provision. Similarly, however, the reasonable-cost reimbursement provision does not provide the sole basis for determining the rights of the parties upon breach.

Stated differently, in the light of the negotiations leading to Modification No. 9 and the language and structure of the cost-limitation provision, we do not think the parties fairly can be said to have intended that the government's only remedy if the plaintiff breached its commitment to complete performance for $12.8 million was its limited redress under the reasonable-cost termination provision of obtaining whatever material the plaintiff had produced under the contract but not delivered. To accept the plaintiff's interpretation of the contract as requiring that result would be to eliminate the protection the $12.8 million cost ceiling was intended to give the government and to eliminate any meaningful method by which the government could enforce that provision. Once again, we rely on the rule that a contract should be "interpreted so as to harmonize and give meaning to all of its provisions." *Arizona v. United States*, 216 Ct.Cl. at 235, 575 F.2d at 863.

The measure of the damages the government suffered if the plaintiff breached that provision would be the expenses the government incurred in completing performance of the contract in excess of the $12.8 million for which the plaintiff agreed to furnish the equipment. The government states that its cost of obtaining the equipment from Texas Instruments was $6.9 million. Because the government has paid the plaintiff $10.6 million, it seeks excess procurement costs of $4.7 million. The government will adjust that figure, presumably, in accordance with whatever it must pay the plaintiff under part II of our opinion. If the Board should conclude that the plaintiff breached the contract and the government therefore properly terminated it for default—an issue on which we intimate no views—then the government is entitled to recover the additional costs over the ceiling price of $12.8 million.

The plaintiff contends, however, that under a reasonable-cost reimbursement provision the government cannot recover its excess procurement costs. It relies upon a Federal Procurement Regulation, 41 C.F.R. § 1–8.604(c) (1980), which states that "a cost-reimbursement type contract does not contain any provision for recovery of excess costs of reprocurement after termination for default."

The flaw in the plaintiff's argument is that this is not simply "a cost-reimbursement type contract." It also includes the cost-limitation provision obligating the plaintiff to complete performance for $12.8 million. The contract thus is a hybrid, and the provision in section 1–8.604(c) that excess procurement costs are not allowed following termination for default of "a cost-reimbursement type contract" does not apply.

The basic nature of a cost-reimbursement contract confirms this conclusion. This type of contract is viewed as a best-efforts agreement. Unlike a fixed-price contract, under which the contractor is obligated to deliver the material or service for the stated price, a cost-reimbursement contract merely requires the contractor to use its best efforts to provide the goods or services at the stated price.

If, despite its best efforts, the contractor cannot meet the contractual requirements, the government has obtained precisely what it bargained for, namely, the contractor's best efforts. The contractor therefore is entitled to receive or retain its costs for what it has done. The government's only right is to the product or services, plans, and equipment for which the contractor was or will be paid under the contract. 2 R. Nash & J. Cibinic, Federal Procurement Law 1639 (3d ed. 1980); U.S. Department of Transportation, General Provisions for Cost-Reimbursement Type Supply Contracts DOT P–4 cl. 39 (1972). For that reason, the government cannot recover excess procurement costs upon the termination for default of a cost-reimbursement contract.

The contract in the present case, however, contains the additional cost-limitation provision, not found in a cost-reimbursement contract but to which the plaintiff explicitly agreed, requiring it to complete performance for a stated amount. The present contract, therefore, is far more than a mere best-efforts undertaking. If the plaintiff has breached its contractual commitment to complete performance for $12.8 million, the government is entitled to recover its damages, which necessarily include any excess cost of reprocurement.

## V. CONCLUSION

To recapitulate, we affirm the Board's ruling that the reasonable-cost termination provision of the contract applies. The plaintiff therefore is entitled to (1) retain the payments it has received, and (2) recover its additional costs under the contract. The result of this ruling is that we grant the plaintiff's motion for summary judgment on its petition insofar as it relates to the question of liability, but deny it with respect to the amount of damages. We also grant the plaintiff's motion for summary judgment with respect to count 4 of the counterclaim, which challenges the Board's interpretation of the contract, which we have upheld. Count 4 of the counterclaim is dismissed.

The plaintiff also is entitled to summary judgment dismissing counts 1 and 3 of the counterclaim, which seek rescission and reformation of the contract, respectively. The plaintiff's motion for summary judgment with respect to those counts of the counterclaim is granted, and they are dismissed.

If the plaintiff breached its obligation to complete performance for $12.8 million so that the government properly terminated the contract for default, then the government is entitled to recover the amount by which its excess costs of reprocurement exceeded that amount. Accordingly, the plaintiff's motion to dismiss or for summary judgment on count 2 of the counterclaim is denied.

The case is remanded to the Department of Transportation Contract Appeals Board to determine: (1) the amount of additional cost under the contract to which the plaintiff is entitled; (2) whether the plaintiff breached its obligation to complete performance for $12.8 million and whether the government therefore properly terminated the contract for nonperformance; and (3) if the Board finds that the plaintiff breached that obligation, the amount of damages to which the government is entitled.

Further proceedings before this court are stayed for six months. Pursuant to Rule 149(f), defendant's counsel is designated to advise the court of the status of the proceedings before the Board. *See also* Rule 150.