**HUGHES COMMUNICATIONS GALAXY, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 91–1032C.

United States Court of Federal Claims.

Sept. 24, 1997.

B. Tollefsen of Hughes Electronics Corp, and Lynda Troutman O'Sullivan, Peter B. Hutt II, Heidi A. Sorenson and Benjamin D.M. Wood of Miller & Chevalier, Chartered.

Geoffrey C. Cook, U.S. Dept. of Justice, Washington, DC, Civil Division, Commercial Litigation Branch, argued for defendant. With him on the briefs were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, Commercial Litigation Branch.

## OPINION AND ORDER

BRUGGINK, Judge.

Plaintiff, Hughes Communications Galaxy, Inc., has moved *in limine* to prevent the government from introducing evidence on whether Hughes, "passed through" to third parties any of the increased costs it incurred as a result of the government's breach of Launch Services Agreement No. 1383–001 ("LSA").[1] The government opposes Hughes' motion *in limine* and has cross-moved to compel Hughes to produce all documents indicating whether Hughes' customers paid, or have an obligation to pay, for any damages or expenses that Hughes seeks to recover from the government for its breach of the LSA. The motions have been fully briefed and argued, and are ready for disposition. For the reasons explained below, Hughes motion is granted and the government's motion is denied.

### Background

The background facts of this case are described at length in prior opinions. *See Hughes Communications Galaxy v. U.S.*, 26 Cl.Ct. 123 (1992) ("*Hughes I*"); *Hughes Communications Galaxy v. U.S.*, 998 F.2d 953 (Fed.Cir.1993) ("*Hughes II*"); *Hughes Communications Galaxy v. U.S.*, 34 Fed. Cl. 623 (1995) ("*Hughes III*"). A brief synopsis of the facts is helpful, however, in under-

Clarence T. Kipps, Jr., Washington, DC, argued for plaintiff. With him on the briefs were John J. Higgins, John T. Kuelbs, Jennifer A. Smolker, M. Keith Nocket, and Scott

---

1. The precise request to which Hughes objects is "whether Hughes's clients or customers for any of the payloads for which Hughes seeks damages paid, or have an obligation to pay, for any of the damages or expenses Hughes seeks in the Complaint." Hughes also contends that the following response by the government to interrogatory no. 32 raises an issue which is irrelevant:

[I]f plaintiff is seeking to collect as damages from the Government costs that it has already recouped in part or in whole from prices charged to its customers or other sources, defendant is not liable for such costs.

standing the issues raised by the parties' motions.

Hughes and NASA entered into a contract in 1985 whereby NASA agreed to use "best efforts" to launch ten Hughes 393 class satellites from the Space Shuttle. Hughes would pay NASA for the launch services, and did, in fact, make partial payments under the contract. However, after the tragic explosion of the Space Shuttle "Challenger" in 1986, NASA was directed by the President to launch only payloads that were "Shuttle-unique," i.e., which required a manned launch, or that implicated national security or foreign policy concerns. The Hughes satellites did not meet these criteria. Accordingly, on October 30, 1986, NASA advised Hughes that:

> It appears almost certain you will not be provided launch services either prior to or after your current contract expires. At the very least, it can be said with absolute certainty that your payloads will be delayed far in excess of the nine-month period described in [the LSA]. Thus, should you wish to terminate your LSA prior to expiration, Article VII provides you may do so based on these delays. Upon termination, your payments to NASA will be refunded in accordance with the terms of the LSA.

In response, Hughes terminated one of the ten launches, the "HC–9 Scheduled Launch," and received a refund from NASA of approximately $5.8 million. Hughes did not terminate the remaining nine scheduled launches, which never occurred. Eventually, Hughes made arrangements to launch its satellites using alternative means, and entered into separate contracts with customers to sell or lease the satellites. This lawsuit followed.

### Issues Presented

The government's liability for breaching the LSA was established in a series of decisions culminating in *Hughes III*. The remaining issue is the determination of damages.

The government apparently intends to argue that any damages it owes to Hughes must be reduced to the extent that Hughes' customers paid, or are obligated to pay, "for any damages or expenses plaintiff seeks from the Government." Hughes, in its motion *in limine*, styles this "a pass-through defense," and argues that whether it "passed through" to third parties any of the increased costs it incurred due to the government's breach is legally irrelevant to the amount of damages it is owed. Therefore, Hughes seeks an order prohibiting the government from introducing evidence concerning whether Hughes "passed through" to its customers any increased costs resulting from the breach.

In its opposition and cross-motion to compel, the government argues that Hughes' damages have been contractually limited to its "actual, increased costs" and that Hughes should not be allowed a "double recovery" from both the government and its customers. The government, accordingly, requests an order directing Hughes to produce documents on whether Hughes has already been paid, or has the right to be paid, for some of its "actual, increased costs."

### Discussion

The general measure of contract damages is settled: enough compensation to place the injured party in the same position as if the contract had been fully performed. *Wells Fargo Bank, N.A. v. U.S.*, 88 F.3d 1012, 1021 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997). In other words, Hughes should receive the benefit of the bargain it struck with the government. The most straightforward measure of that bargain when the breaching party refuses to deliver goods or services is the difference between the contract price and the cost of cover. In this case, that would be the difference between the government's charges for launching the ten payloads and plaintiff's reprocurement costs, if the services can be objectively compared. Added to that would be any other incidental costs incurred because of the breach, to the extent the contract permits recovery of such costs, and deducted would be any unique costs avoided because of the breach. *See* Restatement (Second) of Contracts § 350 comment c ("When a party's breach consists of a failure to ... furnish services ... it is often possible for the injured party to secure similar ... services on the market.... In such cases as these, the injured party is expected to make

appropriate efforts to avoid loss by arranging a substitute transaction."). *Cf.* U.C.C. § 2–712 (injured party can recover "the difference between the cost of cover and the contract price together with any incidental or consequential damages.").

In this case, we have the added consideration of the contract's provisions dealing with damages for breach. The government points to Article 6 of the LSA, which provides as follows:

> 6. *Limitation of the United States Government and Customer Liability*
>
> [T]o the extent that a risk of Damage is not dealt with expressly in this Agreement, the United States Government's liability to the Customer, and the Customer's liability to the United States Government arising out of this Agreement, whether or not arising as a result of an alleged breach of this Agreement, shall be limited to direct damages only and shall not include any loss of revenue, profits or other indirect and consequential damages.

■ From this provision, the government argues that "Hughes may only recover its actual, un-reimbursed costs once and not any loss of revenue, profits, or other consequential damages." Nothing in the LSA supports the addition of a limitation to "un-reimbursed costs." Article 6 of the LSA limits Hughes' recovery to direct damages. As explained above, Hughes' direct damage is the difference between the cost of launching ten payloads under the LSA and the cost of the substitute performance.[2] The general measure of damages, the difference between the contract cost and the cost of cover, is not altered by the LSA. The fact that Hughes may have been able to shift some of those costs by increasing the income side of its ledger sheet is not relevant.

The government's effort to add to this presumptive measure a limitation on "double recovery" is unavailing for several reasons. The court notes initially that, as the plaintiff correctly observes, the cases relied upon by the government, *Morrison–Knudsen Co. v. U.S.*, 184 Ct.Cl. 661, 397 F.2d 826, 844 (1968), and *California Canners & Growers Assoc. v. U.S.*, 7 Cl.Ct. 69, 94 (1984), involve situations in which a plaintiff would have recovered the same costs twice from a single defendant. This is not the situation here.

It strikes the court that the government's motion really addresses two different scenarios. One is that Hughes may have been able explicitly to indemnify itself after the breach by having customers pay, or agree to pay, any of the damages caused by the government's breach. Insofar as the customer does not yet know if there will be additional pass-through costs, it, in effect, becomes a contractual insurer to Hughes. The other possibility is that Hughes may have been able to negotiate re-sale of its satellites for more than what it would have anticipated receiving prior to the breach. Neither inquiry is relevant, however.

■ As to the first, it is clear that the breaching party cannot benefit from such *de facto* insurance, and thus shift the loss to third parties.[3] *See North Slope*, 27 Fed. Cl. at 426–27; *KGM Harvesting Co. v. Fresh Network*, 36 Cal.App.4th 376, 42 Cal.Rptr.2d 286 (1995); *Consolidated Aluminum Corp. v. Krieger*, 710 S.W.2d 869 (Ky.Ct.App.1986); *Northern Arizona Gas Service, Inc. v. Petrolane Transport, Inc.*, 145 Ariz. 467, 702 P.2d 696 (App.1984); *Orange and Rockland Utils. v. New England Petroleum Corp.*, 60 A.D.2d 233, 400 N.Y.S.2d 79 (1977); 4A *Anderson on the Uniform Commercial Code* § 2–712:63. The breaching party is the wrongdoer and should not be able to take advantage of such arrangements by shifting those costs to third parties. Whether the contracting party who suffers the breach is getting paid twice for its costs is a question best worked out between it and its customers. The court should not be in the position of assessing whether the prices to the customers reflect the risk of such pass-through, or whether there is an

---

2. The court does not decide today whether the LSA was a contract for ten launch slots or, instead, a contract for launching ten identified satellites. Nor does the court address whether Hughes' cover was reasonable or appropriate.

3. Unless perhaps the government paid for the insurance. *See North Slope Technical, Ltd. v. U.S.*, 27 Fed. Cl. 425, 426–27 (1992).

obligation to repay any recovery from the government to those customers.

■ As to the second type of pass-through, the court holds that such increases in revenue are not relevant to limit damages. This is no more than the reverse of the general rule that consequential damages are not recoverable by a plaintiff suing the government for breach of contract. I.e., there are certain damages that, as a matter of law, the courts will find too remote—for example, profits lost on collateral business arrangements, or lost opportunity damages. As the Supreme Court stated in *Southern Pac. Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918): "The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if the plaintiff has suffered a loss." *Id.* at 533–34, 38 S.Ct. at 186.

Here, the government is, in effect, trying to assert an equally remote theory to limit damages. It asks the court to speculate on how much of Hughes' price to its customers on subsequently negotiated resale contracts was a pass-through of additional costs. It calls on the court to do highly speculative profit margin comparisons. It is unfair, in addition, to penalize Hughes for any incremental advantage it was able to obtain in negotiations in a competitive market. The inquiry is best ended at "the first step"—did the party who suffered a breach pay more for reprocurement of services? If so, the court will not look to whether its pricing structure incorporates those new costs.

Counsel for the government stated at oral argument that, following the Challenger disaster, the satellite launch industry was in a state of flux, and the market for such services was volatile and dynamic. In a competitive environment, how could the Court segregate the fruits of hard bargaining from the serendipitous results of the breach? The Supreme Court has noted, albeit in the antitrust context, that such a task would present the "nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued." *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 493, 88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968). Because similar market principles are also involved where an overcharge results from a breach of contract, as opposed to stemming from undue market power, the Supreme Court's reasoning in *Hanover Shoe* is equally persuasive here. The best way to ensure that Hughes retains the value of its initial bargain with NASA is to measure the value of what it got through the LSA. That is done by calculating the difference between the cost of what it was to receive and the cost of what it reprocured.

Accordingly, we hold that the government may not assert by way of defense the fact that Hughes recovered from its customers some or all of the increased costs of launching the satellites caused by the government's breach. Hughes is entitled to receive the benefit of its bargain. What Hughes chose to do with that benefit has no impact on the damages calculation in this case.

For the foregoing reasons, it is hereby ORDERED that the government's motion to compel is denied, and Hughes' motion *in limine* is granted.