HUGHES COMMUNICATIONS GALAXY, INC., Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Cross Appellant.

Nos. 00–5109, 00–5119.

United States Court of Appeals, Federal Circuit.

DECIDED: Nov. 13, 2001.

Clarence T. Kipps, Jr., Miller & Chevalier, Chartered, of Washington, DC, argued

for plaintiff-appellant. With him on the brief were Alan I. Horowitz, Peter B. Hutt II, and Angela Barbee Styles. Of counsel on the brief were John J. Higgins and Jennifer A. Smolker, Hughes Electronics Corporation, of Los Angeles, CA.

Janene M. Marasciullo, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellant. With her on the brief was David M. Cohen.

Before MAYER, Chief Judge, LOURIE, and RADER, Circuit Judges.

RADER, Circuit Judge.

Following a trial on damages for breach of contract, the United States Court of Federal Claims awarded Hughes Communications Galaxy, Inc. $102,680,625. *Hughes Communications Galaxy, Inc. v. United States*, 47 Fed.Cl. 236 (2000) (*Hughes V*). Because the Court of Federal Claims did not abuse its discretion in calculating damages, this court affirms.

## I.

This case has received extensive factual analysis in prior opinions. *See Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953 (Fed.Cir.1993) (*Hughes II*); *Hughes V*, 47 Fed.Cl. 236; *Hughes Communications Galaxy, Inc. v. United States*, 38 Fed.Cl. 578 (1997) (*Hughes IV*); *Hughes Communications Galaxy, Inc. v. United States*, 34 Fed.Cl. 623 (1995) (*Hughes III*); *Hughes Communications Galaxy, Inc. v. United States*, 26 Cl.Ct. 123 (1992) (*Hughes I*). This appeal addresses only the Court of Federal Claims' breach of contract damage determination in *Hughes IV* and *Hughes V.*

In December 1985, NASA and Hughes entered into a Launch Services Agreement (LSA), which required NASA to use its "best efforts" to launch ten of Hughes' HS–393 satellites on space shuttles. The LSA required NASA to continue using its best efforts to launch Hughes' HS–393s until it launched all ten HS–393s or until September 30, 1994, whichever was earlier.

NASA compiled "manifests" of all shuttle payloads scheduled for launch on shuttles. NASA reissued these manifests periodically to account for changed circumstances. The manifests listed commercial payloads in order of their planned or firm launch dates and scheduled a shuttle for each launch. After NASA and Hughes entered the LSA, NASA assigned Hughes' satellites specific slots on a manifest.

In January 1986, the space shuttle Challenger exploded. Following the Challenger explosion, NASA suspended operation of the shuttles until September 1988. Further, in August 1986, President Reagan announced that NASA would no longer launch commercial satellites on shuttles. On July 10, 1986, NASA completed the last manifest before President Reagan's announcement. It projected that NASA would launch eight Hughes satellites on shuttles by September 1994. Thereafter, NASA compiled a new manifest that only included "shuttle unique" and "national security and foreign policy" payloads. That manifest did not list any Hughes satellites. Later NASA informed Hughes that it would almost certainly not launch any Hughes satellites on shuttles.

After 1986, Hughes launched three of its HS–393s on expendable launch vehicles (ELVs), one of which was the JCSAT–1. Hughes also launched several similar satellites on ELVs, including six HS–601 satellites. The HS–601s are similar to the HS–393s, except they are more powerful and better suited for ELV launches. While the ELV launches provided an alternative to shuttle launch services under the LSA,

Hughes incurred more costs by launching satellites on ELVs rather than on shuttles.

Hughes sued the United States Government for breach of contract and for taking its property without providing just compensation. The Court of Federal Claims granted summary judgment to the Government on both claims based on the sovereign act defense. *Hughes I*, 26 Cl.Ct. at 144–46. This court reversed that summary judgment and remanded. *Hughes II*, 998 F.2d at 959. On remand, the Court of Federal Claims granted summary judgment for Hughes for breach of contract. *Hughes III*, 34 Fed.Cl. at 634. Before holding a trial on damages, the Court of Federal Claims ruled that the Government could not produce evidence to reduce its damages by the amount Hughes had passed on to its customers in increased prices. *Hughes IV*, 38 Fed.Cl. at 582.

At the damages trial, Hughes sought to prove damages by showing its increased costs in launching satellites on ELVs, rather than on shuttles. Hughes presented two main methods for calculating the increased costs. The first method, the Ten HS–393 Satellites Method, compared the costs of launching ten HS–393s on shuttles under the LSA with the costs of launching ten HS–393s on ELVs. Because Hughes had actually launched only three HS–393s on ELVs, the method based the ELV launch costs on the actual costs of launching the three HS–393s. The second method, the Primary Method, compared Hughes' actual costs of launching ten satellites on ELVs with the costs that Hughes would have incurred by launching ten satellites on shuttles under the LSA. The ten satellites included the three HS–393s, the six HS–601s, and one HS–376.

The Court of Federal Claims used the Ten HS–393 Satellites Method to calculate Hughes' increased costs of "cover." *Hughes V*, 47 Fed.Cl. at 244. However, the court modified the method in several important respects. First, the court found that even using its best efforts, NASA would have only launched five HS–393s under the LSA. Accordingly, the court only awarded Hughes increased costs for five satellites, rather than ten. *Id.* Second, the court averaged the costs of launching on shuttles the three HS–393s that were actually launched on ELVs and used that average for the fourth and fifth satellites, rather than individually calculating the cost of launching each satellite on a shuttle, as Hughes' expert had done. *Id.* at 244 n. 12. Third, in calculating the ELV launch costs for the fourth and fifth satellites, the court escalated the costs using the midpoint between March 1989 and September 1994, rather than the midpoint between March 1989 and December 1995, as Hughes' expert had done. *Id.* at 244. Fourth, the court refused to award Hughes prejudgment interest on its damages. *Id.* at 244–45. Fifth, the court refused to award Hughes reflight insurance costs and increased launch insurance costs for the five satellites. *Id.* at 245–46.

Based on its modified HS–393 method, the court awarded Hughes $102,680,625 in damages for its increased launch costs. *Id.* at 247. Hughes and the Government both appeal. This court has jurisdiction under 28 U.S.C. § 1295(a)(3) (1994).

## II.

■■■ This court reviews damages determinations by the Court of Federal Claims for an abuse of discretion. *Massie v. United States*, 226 F.3d 1318, 1320 (Fed. Cir.2000). This court will consider a trial court to have abused its discretion when: "(1) the court's decision is clearly unreasonable, arbitrary or fanciful; (2) the decision is based on an erroneous construction of the law; (3) the trial court's factual findings are clearly erroneous; or (4) the

record contains no evidence upon which the [trial] court rationally could have based its decision." *Air Land Forwarders, Inc. v. United States,* 172 F.3d 1338, 1341 (Fed. Cir.1999). Contract construction is a question of law that this court reviews without deference. *Winstar Corp. v. United States,* 64 F.3d 1531, 1540 (Fed.Cir.1995), *aff'd and remanded,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). This court reverses factual findings as clearly erroneous if this court "is left with the definite and firm conviction that a mistake has been committed." *Hendler v. United States,* 175 F.3d 1374, 1378 (Fed.Cir.1999).

■ "The general rule in common law breach of contract cases is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." *San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1562–63 (Fed.Cir.1997). Thus, "[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered." *Id.* Moreover, the damages must have been foreseeable at the time the parties entered the contract, which requires that they "be the natural and proximate result of the breach." *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 526 (Ct.Cl.1960). The LSA itself further limits damages to "direct damages only" and excludes consequential damages from any recovery.

■ The Court of Federal Claims awarded Hughes its increased costs of "cover." If a seller breaches a contract for goods, the buyer may "cover" or, in other words, obtain substitute goods from another seller. U.C.C. § 2–712 (1997); E. Allan Farnsworth, *Farnsworth on Contracts,* § 12.11 (2d ed.1998). Additionally, courts often award an analogous remedy for breach of service contracts such as the LSA. Farnsworth, *supra,* § 12.11. While

the cover remedy of the Uniform Commercial Code does not govern this analogous remedy under the LSA, the Uniform Commercial Code provides useful guidance in applying general contract principles. Because both parties and the Court of Federal Claims have referred to this remedy as a "cover" remedy, this court will also use this term to refer to the remedy for Hughes' increased costs of obtaining substitute launch services.

■ The substitute goods or services involved in cover need not be identical to those involved in the contract, but they must be "commercially usable as reasonable substitutes under the circumstances." U.C.C. § 2–712 cmt. 2. Whether cover provides a reasonable substitute under the circumstances is a question of fact. *Bigelow–Sanford, Inc. v. Gunny Corp.,* 649 F.2d 1060, 1065 (5th Cir.1981) (stating that whether cover is reasonable is a "classic jury issue" (quoting *Transammonia Export Corp. v. Conserv, Inc.,* 554 F.2d 719, 724 (5th Cir.1977))).

■ When a buyer of goods covers, the buyer's remedy for the seller's breach as to those goods equals the difference between the cost of the replacement goods and the contract price plus other losses. U.C.C. § 2–712; Farnsworth, *supra,* § 12.11. Similarly, if the seller breaches a contract for services, the buyer's remedy for cover equals the difference between the cost of the substitute services and the contract price plus other losses. Farnsworth, *supra,* § 12.11 (where a building contractor breaches a first contract and the owner obtains substitute performance under a second contract, the owner can recover "any additional amount required by the second contract beyond what the owner would have had to pay under the first").

■ The Government cross appeals, arguing that Hughes should only be able to recover damages for the three HS–393s that it actually launched. While Hughes did not actually launch the fourth and fifth HS–393s that the Court of Federal Claims used to calculate damages, Hughes did incur costs in launching the HS–601s. The Court of Federal Claims found that Hughes developed the HS–601s to replace the HS–393s because the HS–601s were better suited for ELV launches, and that Hughes would have launched ten HS–393s on shuttles, given the opportunity. *Hughes V,* 47 Fed.Cl. at 240–41. The Government disputes these findings, asserting that Hughes developed the HS–601s for independent business reasons, specifically, the more powerful HS–601s were more marketable. On this point, however, the Court of Federal Claims specifically credited testimony of Hughes' witnesses that Hughes would not have developed the HS–601 if the Government had not breached the LSA and that Hughes could have designed the HS–393 to accommodate the additional power of the HS–601. *Id.* at 240. This testimony directly supports the Court of Federal Claims' finding that "the HS–393 could have been used in place of the HS–601" for HS–601 launches during the contract period. *Hughes V,* 47 Fed.Cl. at 240. Thus, the trial court found that the HS–601 launches were reasonable substitutes under the circumstances of this breach.

Additionally, the Court of Federal Claims specifically found that no credible evidence supported the Government's attack on the HS–601 as a reasonable substitute. Specifically, the Government argues that at the time of contracting, the Government could not have foreseen "the demise of the HS–393" as a result of its breach. However, the Court of Federal Claims' damages method does not compensate Hughes for the "demise of the HS–393."

Rather it compensates Hughes for increased launch costs. Had Hughes kept using the HS–393s, it would likely have incurred the same damages that the Court of Federal Claims awarded.

■ In sum, the Court of Federal Claims hinged its determination of this issue on credibility. Such determinations are virtually never clear error. *First Interstate Bank v. United States,* 61 F.3d 876, 882 (Fed.Cir.1995). Furthermore, while the damages calculation might have been easier if Hughes had kept launching HS–393s on ELVs, ease of proof in potential future litigation is not sufficient justification to require Hughes to continue launching satellites that were ill-suited for ELV launches. As the victim of the breach, Hughes was within its rights to obtain commercially reasonable substitute launch services even if the substitute services were not identical to those covered by the LSA. The Court of Federal Claims thus did not clearly err in holding that Hughes successfully covered by launching HS–601s on ELVs. Accordingly, this court rejects the Government's cross appeal.

■ The Court of Federal Claims' use of increased HS–393 launch costs provided reasonable certainty in calculating damages. The trial court compared the costs of launching HS–393s on ELVs with the costs of launching the same HS–393s on shuttles. That comparison provided a basis for assessing Hughes' increased costs in launching the HS–601s. Under this method, the Court of Federal Claims accounted for any measurable difference in value to Hughes between the HS–393 launches and the HS–601 launches. *See* Farnsworth, *supra,* § 12.11 ("[A]ny measurable difference in quality [of a substitute] can be compensated for by a money allowance."). Accordingly, the Court of Federal Claims used the increased costs

for HS–393s as a reasonable approximation of the increased costs incurred by Hughes in launching the substitute HS–601s. Under this method, the trial court did not abuse its discretion. *See S.W. Elecs. & Mfg. Corp. v. United States,* 228 Ct.Cl. 333, 655 F.2d 1078, 1088 (Ct.Cl.1981) (the trial court need only "make a fair and reasonable approximation").

■ The LSA states that damages "shall be limited to direct damages only and shall not include any loss of revenue, profits or other indirect or consequential damages." As discussed above, the increased costs represent direct damages incurred by Hughes in obtaining substitute launch services. Additionally, the damages do not include any lost revenues or profits, only increased costs. Finally, the damages are not consequential. The Uniform Commercial Code is instructive on this point. It allows recovery of the difference between the cost of cover and the contract price *"together with* any incidental and consequential damages," U.C.C. § 2–712 (emphasis added), thereby distinguishing between consequential damages and the direct cost of cover. In sum, the Court of Federal Claims did not abuse its discretion by awarding Hughes damages for its increased costs incurred by obtaining substitute launch services for two HS–601s in addition to the three HS–393s.

•■ Hughes decided to launch the JCSAT–1 satellite, a particular HS–393, on an ELV several months before President Reagan's announcement in 1986 that NASA would no longer launch commercial satellites on shuttles. NASA only breached its best efforts obligation after President Reagan's announcement. *Hughes III,* 34 Fed.Cl. at 630–34; *Hughes V,* 47 Fed.Cl. at 243. However, the LSA is not limited to launching particular satellites, such as the JCSAT–1. Rather, the LSA specifies a particular type of satellite (HS–393) in its preamble, and refers to the ten satellites as "HC–9 through HC–18." Thus, Hughes could have substituted another HS–393 for JCSAT–1, and Hughes still would have launched ten HS–393s on shuttles if NASA had provided those services under the LSA. Accordingly, the Court of Federal Claims did not abuse its discretion by awarding Hughes damages for the increased costs of launching the JCSAT–1.

### III.

■ The Court of Federal Claims found that NASA could have launched five HS–393s during the LSA contract period using its best efforts. The Court of Federal Claims based this finding on the July 1986 manifest, but credited a report by Barrington Consulting Group that unexpected delays beyond NASA's control reduced the number of shuttle launches below the projections in the July 1986 manifest. *Hughes V,* 47 Fed.Cl. at 243. Under the priorities in the July 1986 manifest, the Barrington report concluded that NASA would have launched five HS–393 satellites.

If NASA had given commercial satellites priority over NASA satellites, Hughes asserts, NASA would have launched ten HS–393s. However, before President Reagan's statement, NASA did not elevate commercial launches above its other priorities. NASA did not breach its best efforts obligation before President Reagan's statement. The priorities before President Reagan's statement gave approximately equal priority to commercial and NASA payloads. As the Court of Federal Claims correctly reasoned, Hughes could not have reasonably expected NASA priorities to elevate commercial satellites above other goals for the remainder of the contract period.

Similarly, the LSA's best efforts requirement did not obligate NASA to use the 1984 policy announced in a House subcommittee hearing. In the event of shuttle scheduling conflicts, the 1984 policy gave commercial satellites priority over NASA research and development missions. Under this policy, Hughes asserts, NASA would have launched all ten HS–393s. The LSA itself specifically included a 1982 listing of priorities, but said nothing about the 1984 policy. Without the 1984 policy in the contract, the LSA did not incorporate those priorities into NASA's best efforts obligation.

The Court of Federal Claims also correctly found that circumstances prevented NASA from increasing its launch rates to include all ten HS–393s. In testimony to Congress in 1992, NASA asserted its ability to launch more shuttles than its budget allowed. According to Hughes, the Government chose to limit the number of launches by limiting NASA's budget. The record amply supports the trial court's finding that the post-Challenger investigation and technical problems prevented NASA from launching more shuttles. *Hughes V,* 47 Fed.Cl. at 242–43. The record shows that, in all years except 1994, the Government budgeted for more shuttle launches than NASA was able to launch. In 1994, the Government budgeted for eight launches and NASA actually launched eight. Thus, the Court of Federal Claims did not clearly err in finding that technical obstacles, rather than budget choices, prevented NASA from launching more shuttles during the LSA contract period.

Additionally, Mr. Kiraly, the Government's expert, estimated the number of HS–393s that NASA's best efforts could have launched at between one and six. The variance in this estimate does not undercut the Court of Federal Claims' finding. The Court of Federal Claims relied on the Barrington report, which specifically concluded that NASA's best efforts would have launched five HS–393s. *Id.* at 243. Thus, the Court of Federal Claims did not clearly err in finding that NASA's best efforts would have produced five HS–393 launches.

### IV.

■ Because Hughes actually launched only three HS–393s, the Court of Federal Claims calculated the average costs of launching those three satellites on shuttles. Then, using the report of Hughes' expert, Mr. Hammer, the trial court applied that average to project the shuttle launch costs of the fourth and fifth satellites. *Id.* at 244. Hughes asserts that the Court of Federal Claims should have used the shuttle launch costs for each individual satellite shown in Mr. Hammer's report. However, the trial court's method is symmetrical with its calculation of the costs of ELV launches. For ELV launch costs, the trial court averaged the actual ELV launch costs for the three HS–393s and applied that average to project the ELV launch costs of the fourth and fifth satellites. *Id.* at 244. Hughes does not disagree with the method of calculating ELV launch costs; the Court of Federal Claims merely did the same thing with the shuttle launch costs. The trial court reasonably exercised its discretion in using this symmetrical approach in calculating damages.

### V.

■ To account for escalation in costs over time, the LSA multiplies costs by factors that increase for later launch dates. Accordingly, Mr. Hammer included escalation factors in his ELV launch costs. Mr. Hammer calculated the escalation at the mid-point between March 1989 (the date of the first HS–393 launch) and December 1995 (the date of the last launch under the

Primary Method). Contrary to Mr. Hammer's method, the Court of Federal Claims used the midpoint between March 1989 and September 1994 (the end of the contract period) when calculating the escalation factors. *Id.* Because December 1995 was after the contract period, the LSA could not have obligated NASA to launch a Hughes satellite at that time. Accordingly, the Court of Federal Claims did not abuse its discretion by using the end of the contract period to calculate the midpoint for the escalation factors.

## VI.

 At trial, Hughes did not submit specific evidence of a taking, but argued in its post-trial brief that it was entitled to interest on its damages under the Fifth Amendment. If, as Hughes asserts, the Government's breach of the LSA was a taking under the Fifth Amendment, then nearly all Government contract breaches would give rise to compensation under the Fifth Amendment. This court's predecessor has cautioned against commingling takings compensation and contract damages. Indeed, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978) (citation omitted). Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. *Id.* Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights. *Id.*

 Hughes' asserted right to shuttle space does not distinguish this case from *Sun Oil.* The LSA specifically states that Hughes "does not obtain title to or any other legal or equitable right to or interest in any part of the Space Transportation System." In the LSA, Hughes was simply paying for a service: launch of its satellites. *Sun Oil* involved an oil and gas lease. 572 F.2d at 792. The *Sun Oil* plaintiff sued the Government for taking its lease by delaying permits. *Id.* at 792–93. This court's predecessor recognized "[a]s a general proposition, a leasehold interest is property, the taking of which entitles the leaseholder to just compensation for the value thereof." *Id.* at 818. Nevertheless, the court held that the plaintiff's claim was for breach of contract, not a Fifth Amendment taking. *Id.*

Similarly, the Government was acting in its proprietary capacity when it entered into the LSA. In that capacity, the Government "obtained certain rights and incurred certain responsibilities as did plaintiffs." *Id.* Accordingly, Hughes' claim is only against the Government for breach of contract.

Furthermore, Hughes did not present evidence before the trial court directed specifically to establishing a taking and it appears that the evidence Hughes did present was insufficient. For example, as Hughes apparently admits, the evidence did not establish a categorical taking. Moreover, the evidence did not establish, as Hughes asserts, that the nature of the Government's action was akin to a physical invasion of Hughes' right to shuttle space. As discussed above, Hughes had no such right; Hughes only had a contractual right to launch services. The Court of Federal Claims did not abuse its discretion by refusing to award Hughes prejudgment interest.

## VII.

■ The LSA provided for a free reflight on a shuttle if a satellite was not deployed or the deployment deviated from the specifications (such as if a satellite was not placed in the correct orbit) so long as Hughes provided either the particular satellite or a substantially identical satellite for a reflight. On some ELV launches, Hughes obtained reflight insurance that provided cash refunds if a launch was unsuccessful. The Court of Federal Claims discounted the value of the limited reflight guarantee in the LSA. *Hughes V*, 47 Fed. Cl. at 246. The court also found that the evidence did not show that the cash refund guarantees that Hughes bought for some of its ELV launches were comparable to the LSA reflight clause or that reflight options that it could have selected from ELV providers were comparable to the LSA reflight clause. *Id.*

Mr. Hammer's report valued the reflight clause at $30,343,061. Mr. Hammer arrived at this number by multiplying the total launch costs by a reflight launch insurance cost ratio. Mr. Hammer based that ratio on the launch insurance costs of ten actual satellites launched by Hughes. Hughes' launch insurance included reflight insurance and in-orbit insurance. Mr. Hammer consulted with Hughes and the insurance provider to attribute about 51% of the insurance to the reflight portion. Beyond this calculation, Mr. Hammer made some other minor adjustments. However, Hughes did not show that the reflight insurance for the ELV launches was comparable to the insurance provided by the LSA reflight clause. The insurance for the ELV launches provided the option of purchasing a cash refund guarantee, while the LSA clause only guaranteed a reflight of a substantially identical satellite. In addition, Hughes did not show that the other limitations of the reflight insurance were substantially the same. Without those showings, the Court of Federal Claims did not clearly err in finding the reflight insurance damages speculative. Thus, the trial court did not abuse its discretion in rejecting those damages claims.

## VIII.

■ The Court of Federal Claims held that Hughes' increased launch insurance costs were not direct damages. Thus, these insurances costs were not recoverable because the LSA did not provide such insurance and Hughes was not required to purchase it. *Hughes V*, 47 Fed. Cl. at 245. Rather, Hughes made an independent business decision to obtain launch insurance. *Id.* The court reasoned that Hughes was not contractually required to obtain launch insurance and thus the increased insurance costs were not direct damages. *Id.*

Hughes made the independent business decision to obtain launch insurance. This intervening cause precludes the award of increased insurance costs as direct damages. *See Myerle v. United States*, 33 Ct.Cl. 1, 27 (1897) ("For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage ... There must not be two steps between cause and damage."). Also, while NASA knew that most satellite launches were covered by launch insurance, the record does not show that NASA knew Hughes had launch insurance or that actual launch costs dictated its launch insurance costs. Accordingly, the Court of Federal Claims did not abuse its discretion in holding that the increased launch insurance costs are not recoverable under the LSA.

IX.

■■■■ The Government sought to reduce Hughes' damages by the amount Hughes recouped by increasing prices to customers, in other words, by the amount Hughes "passed through" to its customers. The Court of Federal Claims did not allow the Government to assert this defense at the damages trial. *Hughes IV,* 38 Fed. Cl. at 582. According to the Court of Federal Claims, this type of mitigation is too remote to consider. *Id.*

Although not in the breach of contract context, the Supreme Court has addressed this issue. In *Southern Pacific Co. v. Darnell–Taenzer Lumber Co.,* 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918), a railroad overcharge case, the Court addressed the reduction of damages because the damaged party allegedly passed the unreasonable charge on to its customers. The Court stated: "The answer is not difficult. The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss." *Id.* at 533–34, 38 S.Ct. 186. In an antitrust case, the Court noted that calculating pass-through damages reductions would present "the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 493, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Similarly, allowing a pass-through damages reduction in a breach of contract action would destroy symmetry between reduction and escalation of damages. Moreover a standard for pass-through reductions would entail extremely difficult burdens for the trial court. Thus, the Supreme Court's reasoning also applies to this breach of contract action. The Court of Federal Claims did not abuse its discretion by disallowing pass-through damages reductions.

## CONCLUSION

Because the Court of Federal Claims did not abuse its discretion in determining Hughes' damages for the Government's breach of the LSA, this court affirms.

## COSTS

Each party shall bear its own costs.

AFFIRMED.